UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MERGERS AND ACQUISITION SERVICES,           :
INC.,                                       :
                                            :
                              Plaintiff,    :
                                            :
              -v -                          :
                                            :
ELI GLOBAL, LLC, *and its successors in interest*, *alter*   :
*egos and affiliates*, SOUTHLAND NATIONAL           :
HOLDINGS, LLC, SNA CAPITAL, LLC,            :
SOUTHLAND NATIONAL INSURANCE                :
CORPORATION, and GREG E. LINDBERG,          :
                                            :
                              Defendants.   :
-------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 03/27/2017

1:15-cv-3723-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

## I.   INTRODUCTION

In November 2014, Paul Procops, Vice-President of Plaintiff Mergers and Acquisitions

Services, Inc. ("M&A") received an email from an employee of M&A's former client Eli Global,

LLC ("Eli Global").  In that email, the employee indicated that Eli Global had purchased an

insurance company.  Procops was taken aback.  Earlier that year, M&A and Eli Global had worked

together, pursuant to a contract, to find an insurance company for Eli Global to buy.  In Procops'

view, M&A had introduced the insurance company mentioned in the email to Eli Global; as a result,

under the contract, Eli Global owed M&A fees for its assistance.  That Eli Global terminated its

contract after it signed a stock purchase agreement to acquire its target—but before the deal

technically closed—may reasonably have been considered by M&A as sneaky, even underhanded.

Being sneaky, however, does not necessarily amount to a breach of contract as a matter of law, and

in this case, M&A cannot recover under the contract.  This is primarily because the contract, which

was drafted by M&A, contained a provision—a "fee tail"—that was included to protect against

similar behavior by Defendants.  Because M&A did not satisfy the conditions that it established to

earn payment following termination of its agreement with Eli Global, Plaintiff's motion for summary judgment is denied, and Defendants' motion for summary judgment is granted in part.

## II.      BACKGROUND[1]

Plaintiff in this case is M&A, a small corporation that provides advisory and financial services to other companies.  Pl.'s Resp. to Defs.' Local Rule 56.1 Statement ("Pl.'s 56.1"), Dkt. No. 112 at ¶ 1.  Specifically, M&A specializes in advising and assisting clients that are interested in acquiring insurance companies.  Defs.' Resp. to Pl.'s Local Rule 56.1 Statement ("Defs.' 56.1"), at ¶ 1.  Defendant Eli Global was one such client.  Eli Global was founded by Defendant Greg E. Lindberg ("Lindberg"), an entrepreneur who has founded or acquired over 195 corporations.  Pl.'s 56.1 at ¶ 7; *see also* Affidavit of Betty Rodriguez, Dkt. No. 169 ("Rodriguez Aff.") Ex. 1 ("Lindberg Dep. Tr.") at 16:1-5.  Lindberg's "enterprise of portfolio companies" in the "Eli family of businesses" operates in multiple sectors of the economy.  Pl.'s 56.1 at ¶ 9-10; Defs.' 56.1 at ¶ 4.

### A.   Eli Global and M&A Begin Working Together

Around late 2012 and early 2013, Eli Global became interested in acquiring an insurance company to add to its portfolio.  Despite Eli Global's experience in buying other companies, it had never acquired an insurance company.  *See* Lindberg Dep. Tr. at 95:6-12.  Eli Global therefore turned to M&A for help identifying potential acquisition targets in the insurance industry.  Affidavit of Donald A. Emeigh, Dkt. No. 93 ("Emeigh Aff.") Ex. 1.  Chris Herwig, the "Portfolio Manager for the investments and potential investments of Eli Global and its affiliated entities," and Paul Procops, M&A's Vice President, began discussions over email about the scope of Eli Global's interest and how M&A could help with a potential deal.  Affidavit of Chris Herwig, Dkt. No. 97 ("Herwig Aff.") at ¶ 2; *see also id.* Ex. I.

---

[1] Unless otherwise stated, the following facts are not disputed for purposes of this motion, or are taken in the light most favorable to M&A.

To document the relationship between M&A and Eli Global, on April 17, 2013, the two companies executed a "Fee Agreement" related to one particular acquisition target—Defendant Southland National Insurance Corporation ("SNIC"). Pursuant to that agreement, Eli Global would pay M&A a flat fee of $500,000 in the event that a transaction occurred between Eli Global and SNIC or its parent company, Collateral Holdings, Ltd. ("Collateral"). Pl.'s 56.1 at ¶ 37; Am. Compl., Dkt. No. 38 Ex. A (the "Fee Agreement"). While only Eli Global signed the Fee Agreement, the parties to the agreement were defined as M&A and Eli Global "and its subsidiaries and affiliates." Pl.'s 56.1 at ¶ 38; Fee Agreement. M&A got to work right away. That same day, in order to help Eli Global learn about SNIC, Procops sent Herwig a "briefing book" about SNIC, which he explained "compiles the five year statutory data and provides some expository information pulled from prior AM Best reports when the company was covered." Pl.'s 56.1 at ¶ 61; Herwig Aff. Ex. I at P00385.

Less than two weeks later, on April 29, 2013, Procops told Herwig that he had spoken to Mike Anderson, an executive at Collateral. *See* Herwig Aff. Ex. H; Pl.'s 56.1 at ¶ 41. By email, Procops stated the following: "Spoke with the President of Southland National today. He needs to speak with ownership, but he's open minded to an introductory call. I will be back to you when I hear something concrete." Herwig Aff. Ex. H; Emeigh Aff. Ex. 9. Three days later, on May 2, 2013, Herwig responded to this email, "Sounds good, thanks Paul." *Id.* In his deposition, Procops testified that he received a call from Herwig soon after this email exchange during which Herwig told Procops that Eli Global was "finalizing [its] structure" for an insurance company acquisition and therefore did not want M&A to move forward with its discussions with Collateral. Rodriguez Aff. Ex. 14 ("Procops Dep. Tr.") at 13:24 – 14:8. Herwig did not recall any specific phone calls with Procops in April or May of 2013, but did not dispute that the call occurred. Rodriguez Aff. Ex. 7 ("Herwig Dep. Tr.") at 365:2-11.

After the April exchanges, communication between M&A and Eli Global ceased until August 6, 2013, when Herwig reached out to Procops to say that Eli Global had "just about

finalized our structure" and was therefore interested "in acquiring or reinsuring a block of life business." Emeigh Aff. Ex. 10 at P02034. Procops responded that he would "circle the email around the office, [and] see if any of my colleagues are working on anything." *Id.*

**B. Eli Global and M&A Enter into a New Agreement**

After Herwig and Procops' August email exchange, discussions between M&A and Eli Global again went quiet; it was not until early December 2013 that Herwig reached out to Procops to "just check[] back in" about a potential acquisition of an insurance company. Emeigh Aff. Ex. 11 at P02009. Eli Global explained that it had "broadened [its] scope" in its search for acquisition targets since entering into the Fee Agreement. *Id.* at P02007. Herwig and Procops discussed, via email and a telephone call, a new potential engagement between the companies that would reflect this broader scope.

On December 13, 2013, Procops sent Herwig a proposed "Consulting and Advisory Agreement" (the "Consulting Agreement") for review. Emeigh Aff. Ex. 12 at P01938. The agreement was "an M&A form agreement" that had been used by M&A with other clients. Procops Dep. Tr. at 127:23 – 128:25. While perhaps a "form" agreement, the Consulting Agreement was by no means a model agreement, as it was rife with typographical errors and failed to define a number of capitalized terms. Regardless, on December 16, 2013, Herwig returned the signed engagement letter without making any changes and asked for instructions for wiring the retainer required pursuant to the agreement. *Id.*; Emeigh Aff. Ex. 12 at P01938. The Consulting Agreement expressly superseded "all prior understandings and agreements," including the Fee Agreement. Consulting Agreement at § 13; Pl.'s 56.1 at ¶ 45.

The Consulting Agreement was "both advisory and success based," and the contract divided M&A's obligations and Eli Global's duty to provide compensation for M&A's services into two parts. Emeigh Aff. Ex. 12 at P01948. First, the agreement provided that M&A would provide advisory services to Eli Global, including identifying and contacting potential "Target" insurance

4

companies on behalf of the "Company," defined as "Eli Global LLC."  *See* Am. Compl. Ex. B (the "Consulting Agreement") at §§ 1(a)-(b).  The Consulting Agreement did not identify a particular target company, but instead defined "Target" as "any insurance company or the assets and liabilities of any insurance business (asset sale)."  Pl.'s 56.1 at ¶ 49; Consulting Agreement, Definitions.  In exchange for this service, Eli Global was required to pay M&A a "monthly advisory fee" of $15,000 during the term of the agreement.  *Id.* at § 3(a).

Second, the Consulting Agreement imposed an obligation on Eli Global to compensate M&A in the event that Eli Global entered into a transaction with a Target.  Specifically, section 3 of the Consulting Agreement provided that if Eli Global pursued such a transaction, M&A would act as Eli Global's advisor for the acquisition, and would be paid a "Success Fee" of $500,000 or 3% of the total consideration referenced in a definitive Stock Purchase or Asset Purchase Agreement at closing of that transaction.  *Id.* at § 3(b).

The Consulting Agreement contained a termination provision that allowed either party to terminate the agreement with 30-days' notice but provided no other restraints on termination.  *Id.* at § 2.  In order to protect itself against an attempt by Eli Global to circumvent its obligations under the Consulting Agreement by terminating the agreement and shortly thereafter closing a deal with a company identified by M&A, M&A included in its termination section a "fee tail" provision.  That provision of the agreement would allow M&A to capture its fee if Eli Global closed a transaction after the agreement's termination.  The fee tail applied only in limited circumstances described in the agreement.  Specifically, if Eli Global were to terminate the Consulting Agreement by writing, it would be obligated to pay M&A a Success Fee for "any Transaction with a Target *Introduced* to the Company by M&A, which Closes within the period ending 18 months after the date of the termination of this Agreement."  *Id.* (emphasis added).

Further, section 3(d) of the agreement stated that "[t]he Company agrees that no affiliate and/or subsidiary shall enter into a Transaction with a Target *Introduced* by M&A without M&A's

written approval." *Id.* at § 3(d) (emphasis added).  So, both section 2 and section 3(d) of the

Consulting Agreement applied exclusively to a Target "Introduced" by M&A.  As used in those

sections, the word "Introduce" was defined as:

> [A] Target company presented by M&A to the company where M&A provides (i) financial information on the Target (such as statutory statements, briefing books, etc), and (ii) arranges meeting (face to face or telephonic) between the Company and a Target, or (iii) facilities a non disclosure and/or confidentiality agreement between the Company and a Target.

Consulting Agreement, Definitions.

### C.  M&A's Work Under the Consulting Agreement

In late January 2014, the two companies continued discussions about potential acquisition

targets for Eli Global.  Pursuant to its obligations under the Consulting Agreement, on January 22,

2014, Procops sent Herwig a "preliminary life and health .xl screen."  This Excel spreadsheet listed

almost 100 insurance companies and contained information about each of those companies' assets

and income.  Emeigh Aff. Ex. 15 at 4-5.  M&A color-coded the companies on the spreadsheet to

indicate viability for acquisition by Eli Global.  *See* Herwig Aff. Ex. L at P01822 ("As a guide,

companies in red M&A, [sic] has an active engagement with, or knows they're expanding, or is part

of a larger insurance group, or is part of a large organization such as a church or state fund.

Companies in yellow are companies M&A believes to be 'maybe's' based on prior conversations.

Finally, companies in green, M&A believes are available.").  SNIC was of the companies highlighted

in green on this spreadsheet.  Emeigh Aff. Ex. 15 at 4-5.

Herwig acted on this information promptly, and emailed Procops the next day, explaining

that he "went back through [his] notes on Southland from when [Procops] sent it over the

summer . . ." and noted that Southland "could be interesting."  *See* Herwig Aff. Ex. L at P01821-

P01822.  On January 27, 2014, Herwig requested to speak to Procops about three companies listed

on the Excel spreadsheet that Eli Global "would like to go after and arrange meetings with . . . ,"

one of which was SNIC. *Id.* at P01820. A call between Herwig and Procops took place the next day. *See id.*

On January 29, 2014, Procops contacted SNIC. Pl.'s 56.1 at ¶ 67. Procops did not immediately provide an update to Eli Global, so a few days later, Eli Global followed up to ask whether any progress had been made arranging a meeting with SNIC. *Id.* at ¶ 68. Procops responded that M&A had reached out to Anderson, but "have yet to get a definitive response from either as to whether or not they would entertain discussions." Herwig Aff. Ex. M. at P01801. Procops added that he thought it was "a bit preemptive to try and schedule a meeting at this point." *Id.*

In an attempt to pique SNIC's interest in Eli Global, on February 10, 2014, M&A sent Anderson a one-page document containing general information about the Eli family of businesses. Pl.'s 56.1 at ¶¶ 71-72. Eli Global authored this document and had previously provided it to M&A. *Id.* M&A could not, however, arrange a meeting between Eli Global and Collateral because, as Anderson explained to Procops, SNIC was "currently under an exclusivity provision" in connection with another potential deal. Emeigh Aff. Ex. 13 at P01758. On February 21, 2014, Procops told Eli Global about the exclusivity provision, but stated that he "will be following up with Mike [Anderson] near the end of the 30 day exclusivity period, and Mike assured me that he would be circling back with us if problems arise with the party they're currently in discussions with." *Id.* Lindberg thanked Procops for the update and noted that "Southland would be an ideal target" for Eli Global. *Id.*

### D. Eli Global Independently Engages with Collateral

At the same time that M&A was reaching out to SNIC and other potential targets on Eli Global's behalf, a separate and independent company—the Cathcart Group—was also looking into acquiring SNIC. The Cathcart Group, however, did not have the funding to complete such a transaction on its own. Pl.'s 56.1 at ¶ 82; Rodriguez Aff. Ex. 6, Herwig Dep. Tr. at 282:24 – 284:8.

As a result, in April 2014, the Cathcart Group reached out to Eli Global about securing funding for a transaction that would result in Eli Global gaining ownership over a percentage of an "insurance company." Emeigh Aff. Ex. 20 at ELI0509. In an April 21, 2014 email from Dan Cathcart of the Cathcart Group to Herwig, Cathcart noted two potential deal structures with a company identified merely as "insurance company," and asked for Herwig to provide financial documents indicating Eli Global's source of capital for this anticipated transaction. *Id.* Later that same day, Cathcart replied to his previous email emailed and noted, for the first time that, "By the way, the company is Southland National Insurance Company." *Id.* at ELI0508. In subsequent emails Lindberg asked Herwig, "So the game gets more interesting . . . [w]asn't Southland one of those that 'got away'?" *Id.* at ELI0507.

Eli Global wasted no time acting on this potential deal. Promptly after this exchange, Eli Global had a phone call with Collateral, and on April 28, 2014, Defendant Southland National Holdings, LLC ("Southland Holdings") was formed to acquire SNIC. Pl.'s 56.1 at ¶¶ 25, 85; Herwig Aff. Ex. D. The next day, on April 29, 2014, Lindberg, Herwig, and Eli Global associate Devin Solow met with Collateral executives Anderson, Will Ratliff, Henry Caldwell, and James Leitner for the first time in Birmingham, Alabama. Herwig Aff. Ex. T; Rodriguez Aff. Ex. 12, Anderson Dep. Tr. at 120:16 – 121:8. From there, things moved quickly. On April 30, 2013, Eli Global and Collateral entered into a Confidentiality Agreement. Pl.'s 56.1 at ¶ 91; Herwig Aff. Ex. U. The very next day, Collateral Holdings, Ltd., Southland National Holdings LLC, and Lindberg entered into a stock purchase agreement pursuant to which Collateral would sell SNIC to Southland Holdings. Pl.'s 56.1 at ¶ 96; Herwig Aff. Ex. E. While the stock purchase agreement was signed on May 1, 2014, the closing of the acquisition was contingent on regulatory approval by the Alabama Department of Insurance, and thus the transaction did not close at signing. Herwig Aff. Ex. E at § 6.1(b). Later that month, Lindberg created Defendant SNA Capital, LLC ("SNA") for the purpose of consummating the SNIC acquisition. Pl.'s 56.1 at ¶ 20; Herwig Aff. Ex. B.

8

### E.  Eli Global Terminates the Consulting Agreement

Eli Global did not tell M&A about the Cathcart Group's invitation to take part in an insurance company acquisition, nor did it tell M&A that it had independently connected with SNIC. Despite the fact that Eli Global and M&A continued to actively discuss other potential acquisition targets and work to arrange meetings with those other targets in May and into June 2014, *see, e.g.*, Emeigh Aff. Ex. 28, M&A was not aware of any of the negotiations, agreements, or in-person meetings between Eli Global and SNIC simultaneously taking place, and did not know that a stock purchase agreement had been signed between SNIC, Southland Holdings, and Lindberg.  *See* Procops Dep. Tr. at 171:10-13.

On June 10, 2014, over a month after that stock purchase agreement was signed, Eli Global chose to terminate the Consulting Agreement with M&A pursuant to section 2 of the agreement. Emeigh Aff. Ex. 18.  The same day, M&A's Joseph Murgio memorialized the cancellation in a letter, which stated that the effective termination date of the Consulting Agreement would be July 10, 2014.  Emeigh Aff. Ex. 17.  The letter contained a list of companies that would fall under the eighteen-month "fee tail" provision—that is, companies for whom a transaction with Eli Global would trigger the obligation for Eli Global to pay M&A a Success Fee.  Those companies were "Mountain Life Insurance Company, Old United Life Insurance Company, [and] First Trinity Life Insurance Company."  *Id.*  Tellingly, SNIC was not included in this list.  *Id.*

### F.  Eli Global Acquires SNIC

One month after Eli Global terminated the Consulting Agreement with M&A, in August 2014, the Alabama Department of Insurance approved Southland Holdings' acquisition of SNIC. Pl.'s 56.1 at ¶ 113.  Soon after, Southland Holdings paid the purchase price for SNIC and the acquisition closed.  *Id.* at ¶¶ 114-115.  Throughout the regulatory approval process and closing, M&A remained none the wiser to Eli Global's transaction with SNIC.  Indeed, it was not until November 2014, when an Eli Global associate emailed M&A about another potential engagement

and described Eli Global, "as the parent company of Southland National Insurance Corporation" that M&A first realized that Eli Global had closed on an acquisition of an insurance company. Emeigh Aff. Ex. 19; *see also* Procops Dep. Tr. at 72:13-19, 170:10-19.

M&A promptly took the position that Eli Global owed it a Success Fee under the Consulting Agreement by virtue of Eli Global's acquisition of SNIC.  From M&A's perspective— unaware of the adventitious connection through the Cathcart Group—M&A's work for Eli Global was the only reason SNIC and Eli Global were aware of each other.  And Eli Global was duplicitous in not informing M&A of its negotiations, meetings, and eventual agreements with SNIC.  Although the parties did not communicate extensively after M&A learned of the SNIC acquisition, during his deposition, Procops recounted one particular December 2014 phone call he witnessed.  During the call, which took place between Emeigh and Lindberg, Emeigh asked why Eli Global had failed to inform M&A about the SNIC acquisition.  According to Procops, Lindberg responded by providing two options to M&A:  "You can reengage with us . . . or you could sue us and I'll fight to the death."  Procops Dep. Tr. at 261:21 – 262:8.  M&A chose the latter.

## III.    PROCEDURAL POSTURE

On May 14, 2015, M&A brought this action for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, quantum meruit, and tortious interference with contract against Defendants.  On April 8, 2016, the parties cross-moved for summary judgment.  Because the Court has determined that no reasonable jury could find that M&A's performance under the Consulting Agreement was sufficient to trigger Eli Global's obligation to pay a Success Fee, and because the Court has determined that one sentence in the Consulting Agreement is ambiguous and thus precludes a finding of summary judgment on one portion of one claim, Defendants' for summary judgment is GRANTED IN PART and DENIED IN PART.  Plaintiff's motion for summary judgment is DENIED.

IV.    **ANALYSIS**

A.  **Legal Standard**

A moving party is entitled to summary judgment if it can "show[ ] that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To defeat a motion for summary judgment, the non-moving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotations omitted). A party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). Rather, the Court must decide whether a rational juror could find in favor of the non-moving party. *Id.* In resolving cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the

party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

### B. Breach of Contract Claim

M&A argues that Eli Global breached sections 2, 3(b), and 3(d) of the Consulting Agreement by not making M&A the "Company's advisor" in connection with Eli Global's acquisition of SNIC, by not paying M&A a Success Fee at the closing of the SNIC transaction, and by causing companies within the Eli Global family, particularly SNA and Southland Holdings, to complete the SNIC acquisition. Eli Global, by contrast, argues that the duty to pay a Success Fee never arose because Southland Holdings, not the defined "Company" Eli Global, "acquired control" of SNIC. Further, Eli Global contends that M&A did not adequately perform under the contract and thus the duty to pay the Success Fee never arose.

Because the Consulting Agreement provided that it was governed by New York law, the Court will apply New York law in this case. Consulting Agreement § 5. The legal principles applicable to the parties' contentions are well-established. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

"The primary objective in contract interpretation is to give effect to the intent of the contract parties 'as revealed by the language they chose to use.'" *Sayers v. Rochester Telephone Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (quoting *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)); *see also Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002. In doing so, "words and phrases are to be given their plain and ordinary meaning, and New York courts will commonly refer to dictionary definitions in order to determine that meaning." *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 390 (S.D.N.Y. 2014) (citing *Mazzola v. Cnty. of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988)). In

interpreting a contract, "[c]ourts may not 'by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009) (quoting *Reiss v. Fin. Performance Corp.,* 764 N.E.2d 958, 961 (N.Y. 2001)). Furthermore, "the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Bank of New York v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 557 (S.D.N.Y. 2009) (citing *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992)).

Generally, a motion for summary judgment may only be granted when a contract at issue contains language that is "unambiguous and conveys a definite meaning." *Sayers*, 7 F.3d at 1094. Neither party claims that the contract is ambiguous; instead, they each offer competing interpretations of its requirements. Still, whether the language of a contract is ambiguous is a question of law to be decided by the trial court. *Id.* at 1095. A term in a contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989)).

1.   The Consulting Agreement Did Not Require a "Direct" Acquisition

Eli Global argues that its duty to pay a Success Fee never arose because Southland Holdings, not Eli Global, purchased SNIC. However, Eli Global's duty to pay the Success Fee would have accrued even if a controlled Eli Global subsidiary or affiliate had entered into a transaction with a Target. As Plaintiff correctly notes, there is nothing in the Consulting Agreement that states the Success Fee is triggered only if Eli Global is the *direct* purchaser of the shares of SNIC stock. Pl.'s

13

Mem. of Law in Support of Mot. for Summ. J. ("Pl. Mot. For Summ. J."), Dkt. No. 91 at 15-16.
The Court will not read such a qualification into the contract. The contract requires only that Eli
Global "acquire control" of the target; read broadly in accordance with its plain meaning, there is no
limitation in this phrase that would necessitate that the acquisition of control be "direct." Thus if all
other conditions had been satisfied, Eli Global would have been obligated to pay a Success Fee if
one of its controlled subsidiaries or affiliates "indirectly" acquired the shares of SNIC.

> 2.  The Consulting Agreement Terminated Before the Acquisition of SNIC Closed

M&A claims that Southland Holdings' acquisition of SNIC breached the first sentence of
section 3(b) of the Consulting Agreement, which required the payment of a Success Fee "at each
Closing of a Transaction or Transactions." M&A argues that because the stock purchase agreement
was signed prior to the termination of the Consulting Agreement, the acquisition happened while
the contract was still in place. The undisputed facts in the record show, however, that the SNIC
transaction did not "close" during the term of the contract. The stock purchase agreement between
Collateral and Southland Holdings explicitly stated that the transaction would not close until the
requisite regulatory approvals were obtained from the Alabama Department of Insurance, which
occurred in August 2014. Pl.'s 56.1 at ¶ 112-113; *see also* Herwig Aff. Ex. E at § 6.1(b). As the
Consulting Agreement was terminated effective July 10, 2014, the closing of the SNIC transaction—
which took place over one month later—did not trigger an obligation to pay a Success Fee under the
first sentence of section 3(b) of the agreement.

Instead, the closing of the transaction occurred during the time period when the "fee tail"
provision of section 2 of the Consulting Agreement was in place. Recall that the fee tail provision
provided that if Eli Global terminated the Consulting Agreement in writing, M&A would be entitled
to a Success Fee "for any Transaction, with a Target Introduced to the Company by M&A, which
Closes within the period ending 18 months after the date of the termination of this Agreement."
Because the Consulting Agreement terminated in July 2014 and the acquisition of SNIC closed in

August 2014, any Success Fee due from Eli Global to M&A would have to be due under the fee tail provision, or not at all.

3. M&A Failed to "Introduce" SNIC to Eli Global

A number of Plaintiff's claims—including the claim that it was owed a Success Fee under the fee tail—turn on whether M&A "Introduced" the Target. The fee tail provision quoted above only applied to "a Transaction[] with a Target *Introduced* to the Company by M&A." Similarly, section 3(d) of the Consulting Agreement provided "[t]he Company agrees that no affiliate and/or subsidiary shall enter into a Transaction with a Target *Introduced* by M&A without M&A's written approval."

Under both of these sections of the Consulting Agreement, M&A's "Introduction" of a Target was a condition precedent to Eli Global's obligation to pay a Success Fee. *See Edelman Arts, Inc. v. Art Intern. (UK) Ltd.*, 841 F. Supp. 2d 810, 823 (S.D.N.Y. 2012) (explaining that New York law recognizes two types of conditions precedent, one of which "a condition that must occur before a party's performance under an existing contract becomes due") (citing *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995).

As stated above, "Introduce" was defined in the Consulting Agreement as follows:

[A] Target company presented by M&A to the Company where M&A provides (i) financial information on the Target (such as statutory statements, briefing books, etc), and (ii) arranges meeting (face to face or telephonic) between the Company and a Target, or (iii) facilities a non disclosure and/or confidentiality agreement between the Company and a Target.

*Id.* While there are three "sub-sections" of this definition, the Court construes the above definition to mean that there were two ways in which M&A could have introduced a target: it could have either (1) provided financial information *and* arranged a meeting, or, in the alternative could have (2) facilitated a non-disclosure agreement.

a.   <u>Work under the Fee Agreement Counts</u>

As a threshold issue in considering whether M&A introduced SNIC to Eli Global, the Court must determine whether acts taken by M&A during the period in which the Fee Agreement was in effect—from April 2013 through December 2013—can be considered to have satisfied the conditions precedent under the Consulting Agreement, or if the Consulting Agreement by its terms only gives credit for work performed after it was executed in December 2014.[2]

The Court believes that the definition of the term "Introduce" in the Consulting Agreement is arguably ambiguous as to whether it includes pre-Consulting Agreement work by M&A.  It is reasonable to read the phrase "presented by" as describing either a Target presented at a time beginning from the effective date of the agreement onwards, or instead as referring to a Target that was presented at *any* time—before or after the Consulting Agreement was signed.  Although ambiguity in contract language generally precludes a court from ruling on a motion for summary judgment, this particular ambiguity does not impact the Court's ultimate conclusion.  Therefore, for purposes of this decision, the Court will construe the term as suggested by Plaintiff.  *See AIU North America, Inc. v. Caisse Franco Neerlandaise de Cautonnements*, 72 F. Supp. 2d 350, 354-55 (S.D.N.Y. 1999) ("[I]f neither interpretation would allow plaintiff to recover, divining the correct contractual interpretation remains a question of fact but an immaterial fact, and thus cannot salvage plaintiffs' breach of contract claim.").

The Court will thus consider all of M&A's work for Eli Global to assess whether it fulfilled the conditions precedent to payment of a Success Fee.  The question is whether that work satisfied one of the two prongs of the definition of "Introduce"—that M&A provided financial information

---

[2] The case law cited by Defendants to argue that pre-Consulting Agreement work should not be considered in determining whether M&A satisfied the condition precedent is inapposite.  Defs.' Reply Brief, Dkt. No. 132 at 7-8.  Those cases rely on a New York statute that applies to past *consideration.*  *See* N.Y. Gen. Oblig. Law § 5-1105.  M&A's performance under the Consulting Agreement was not, however, consideration necessary for the formation of the contract.  It is more appropriately considered to be conduct, the performance of which would have satisfied the later agreement's conditions precedent, thereby entitling M&A to a Success Fee.

on the Target *and* arranged a meeting between the Company and a Target; *or* that M&A facilitated a non-disclosure agreement between the Company and a Target.  As explained below, the Court determines that no reasonable jury could find that either prong was satisfied.

      b.  <u>M&A Provided Financial Information about SNIC</u>

Under the first prong of the definition of "Introduction," the Consulting Agreement required that M&A provide "financial information on the Target (such as statutory statements, briefing books, etc)."  The undisputed facts show that M&A sent information that might satisfy this obligation on two occasions.  First, when operating under the Fee Agreement in April 2013, M&A send Eli Global a "briefing book" and "statutory statement" documenting SNIC's 2012 financials. Second, when operating under the Consulting Agreement in January 2014, M&A provided Eli Global with an Excel spreadsheet which included information about SNIC along with information about other companies.  Defendants suggest that M&A did not fulfill the obligation to "provide financial information," because all of the information was compiled from publicly-available information.  In support, Defendants point to deposition testimony wherein M&A's representative explained that "there's no such thing as private insurance information.  Everything is public." Procops Dep. Tr. 134:16-18.  Additionally, Eli Global contends that the 2014 Excel spreadsheet was not financial information because M&A did not provide the "underlying financials" used to construct the spreadsheet.

Defendants' arguments fail, as they essentially seek to build in terms that would qualify or modify the term "financial information" under the Consulting Agreement.  There is no qualification in the "financial information" clause—or in the agreement read as a whole—that would suggest that the only financial information that would satisfy this provision is privately-held information, or information which was accompanied by underlying financial statements and calculations.  Read broadly in accordance with its standard meaning, "financial information" does not require the additional supporting documents Defendants argue were necessary.  Indeed, if the Court were to

accept both Defendants' proposed reading of the term "financial information" and Plaintiff's representative's contention that all financial information about insurance companies is public, there would be no circumstance under which M&A could perform under this prong of the Consulting Agreement. The Court will not add a qualifying term to the contract. *See Riverside S. Planning Corp*, 920 N.E.2d at 363 ("Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.")(citation omitted). The undisputed facts in the record establish that M&A did provide financial information to Eli Global about SNIC, satisfying the first part of the first prong of the definition of "Introduce" under the Consulting Agreement.

c.   M&A Did Not Arrange a Meeting Between Eli Global and SNIC

The second part of the first prong of the definition of "Introduce" required that M&A "arrange[] a meeting (face to face or telephonic) between the Company and a Target." It is undisputed that the first meeting between Eli Global and Collateral took place in April 2014, and that M&A had absolutely no involvement with that meeting. Procops Dep. Tr. at 194:2-19. Plaintiff contends that although it played no role in that first meeting, M&A nevertheless "arranged" that meeting. Plaintiff points to the April 29, 2013 email from Procops to Herwig in which Procops indicated, following a telephone conversation with Anderson from Collateral, that Anderson was "open minded to an introductory call." Plaintiff ignores that even that statement was conditioned on Anderson first speaking with SNIC's ownership. Nonetheless, Procops testified—in a conclusory manner—that his conversation with Anderson was sufficient to have "arranged" a meeting. Procops Dep. Tr. at 12:22-25. Although Defendants argue in response that M&A did not arrange a meeting, there is no disputed fact here. Affording the word "arrange" its standard meaning, the undisputed facts in the record clearly show that no meeting was arranged.

Because "arrange" is not defined in the Consulting Agreement, the Court will construe this contractual term according to its plain and ordinary meaning. Webster's Third New International

Dictionary (1993) defines the transitive verb "arrange" as follows: "(1) to put in correct, convenient, or desired order, adjust properly; (2) to put in order beforehand, make preparations for, plan." Similarly, the Oxford English Dictionary defines "arrange" as: "(1) to put (the parts of a thing) into proper or requisite order; to adjust; (2) to settle the order, manner, and circumstantial relationship of (a thing to be done); to plan." *Arrange*, OED ONLINE, http://www.oed.com/view/Entry/10965?redirectedFrom=arrange (last visited March 24, 2017). In a case similar to this one, a court in this district held that "in accord with the generally understood meaning" of the word "arranging," plaintiff's argument that it had "arranged" a meeting between a defendant and a third party did not hold water because the plain meaning of the word "arrange" unambiguously required that the plaintiff "come to an agreement with both a representative of [the third party] and a representative of [the defendant] that the two would come together in some fashion to discuss the purchase of [target] by [the defendant]." *Henry Ansbacher, Inc. v. Ingram Industries, Inc.*, No. 92-cv-3760, 1994 WL 202572, at *1 (S.D.N.Y. May 24, 1994). In that case, as is true here, such a meeting did not happen, and therefore plaintiff did not satisfy the plain meaning of the term "arrange." *Id.*

That Anderson indicated he was "open minded" to a call does not mean that the call was planned or prepared for, particularly given that Procops mentioned in his email to Eli Global that Anderson would "need[] to speak with ownership."[3] This does not support the contention that Anderson was ready to have a meeting, or even willing to meet with Eli Global. Procops' own email shows that Anderson's open-mindedness to an introductory call did not amount to a "plan" when he told Herwig, "I will be back to you when I hear *something concrete*." (emphasis added). Plaintiff's own words, therefore, show that *nothing* concrete was arranged in April 2013.

---

[3] Being "open-minded" means "being receptive of arguments and ideas." *Open-Minded*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1993).

Moreover, the fact that Procops noted in February 2014 that it would be "a bit preemptive to try and schedule a meeting at this point" strongly supports the factual evidence that M&A had not already arranged a meeting back in April 2013.  Ultimately, there was nothing "put in order beforehand," and nothing about the "order" or "manner" of the meeting was settled by virtue of M&A's communication with Collateral.  If anything, Procops' contact with Anderson was a plan to potentially arrange a phone call at a later time if SNIC's ownership approved, and that does not comport with the plain meaning of "arrange" as used in the Consulting Agreement.  Under the plain meaning of the word "arrange" as used in the Consulting Agreement, M&A was required to come to an agreement with both Eli Global and Collateral that the two would come together.  Despite Plaintiff's well-scripted testimony that urges this conclusion, no reasonable jury could find that M&A arranged a meeting between Eli Global and Collateral.

M&A also argues that the only reason that the call did not actually happen was because Eli Global decided it was not yet ready to pursue a transaction.  Judge Martin addressed a similar argument in *Henry Ansbacher*, and found that argument to be irrelevant because even if plaintiff were willing to attend a meeting, no such meeting was planned.  1994 WL 202572, at *1 ("[E]ven if [defendant] was, in fact, unwilling to attend a meeting, his refusal made no difference because [plaintiff] also was unable to get [target] to agree to such a meeting.").  Here, M&A did not have a meeting arranged because Collateral had not yet agreed to one.  Eli Global's suggested unwillingness to participate at that time—a fact not clearly supported in the record—is therefore immaterial.  The undisputed facts in the record clearly show that M&A's perfunctory contact with Collateral could not be viewed by a reasonable jury as "arranging" a meeting as required by the Consulting Agreement.  As a result, M&A did not satisfy this portion of the first prong of the definition of "Introduce" under the Consulting Agreement.

d. <u>M&A Did Not Facilitate the NDA between Eli Global and Collateral</u>

Under the Consulting Agreement, M&A could have also "Introduced" SNIC to Eli Global if it satisfied the second prong of the definition, by "facilitat[ing] a non disclosure and/or confidentiality agreement between the Company and a Target." In this case, it is undisputed that the only confidentiality agreement between Eli Global and Collateral was entered into on April 30, 2014 following the first in-person meeting between representatives from Eli Global and Collateral. *See* Herwig Aff. Ex. U; Pl.'s 56.1 at ¶¶ 91-92. It is also undisputed that M&A did not attend that meeting, did not take any part in drafting the agreement, and did not provide any input into the agreement. *See* Procops Dep. Tr. at 43:8-13.

As with the word "arrange," the word "facilitate" must be read with its plain and ordinary meaning. "Facilitate" means "to make easier or less difficult" or to "lessen the labor of." *Facilitate,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993). The Oxford English Dictionary defines the word to mean "to make (an action, process, etc.) easy or easier; to promote, help forward; to assist in bringing about (a particular end or result)." *Facilitate*, OED ONLINE, http://www.oed.com/view/Entry/67460?redirectedFrom=facilitate#eid (last visited March 24, 2017).

M&A contends that it facilitated that agreement because it "laid the groundwork" for the agreement by identifying SNIC as a prospective Target and compiling SNIC's background and financial information. Pl's Mot. for Summ. J. at 17-18. This information, Plaintiff argues, made the signing of the confidentiality agreement easier. Therefore, in Plaintiff's view, it facilitated the agreement despite the fact that M&A was not even aware that the agreement existed until many months after it was signed. The Consulting Agreement required, however, that M&A facilitate *the non-disclosure agreement itself*, not the process by which the agreement came to be signed. Moreover, the construction suggested by Plaintiff would render this section meaningless. Plaintiff's position is that information that it provided to Eli Global regarding a potential target would satisfy this

requirement by easing Eli Global's evaluation of the target. But if that were the case, then any company that Eli Global entered into a confidentiality agreement with for which M&A also provided financial information—including the almost 100 companies included on M&A's Excel spreadsheet—would meet this requirement. This proposed construction of the contract would convert this provision from one requiring facilitation of *an agreement* to one requiring facilitation of *a transaction*. A Court may not read a provision of a contract in a way that would render the provision meaningless, and thus cannot adopt Plaintiff's perspective given the undisputed facts that M&A was in no way connected to the confidentiality agreement between Eli Global and Collateral. No reasonable jury could find that M&A facilitated the confidentiality agreement in this case.

Because M&A did not facilitate a non-disclosure agreement, and did not arrange a meeting between Eli Global and Collateral, M&A did not "Introduce" SNIC as a Target under the Consulting Agreement. As such, no duty arose for Eli Global to pay M&A a Success Fee at closing as would be required under section 2 of the agreement. *See Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081 (N.Y. 1984) (finding that failure to fulfill a condition precedent "excuses performance by the other party whose performance is so conditioned"). Similarly, without an Introduction, no duty arose for Eli Global to pay M&A a Success Fee under section 3(d) of the Consulting Agreement.

Importantly, the letter that M&A itself drafted to memorialize the termination of the contract provides strong factual support for the Court's conclusion that the actions M&A took in performing under the Consulting Agreement did not amount to an "Introduction." In its termination letter, M&A listed three companies to be included in its "fee tail," meaning that if Eli Global were to enter into a transaction with any of those companies, M&A would be entitled to a Success Fee. M&A did not include SNIC in that list, which at the least suggests strongly that M&A did not at the time view its work related to SNIC as an "Introduction" as defined in the Consulting Agreement.

### 4.   The Second Sentence of Section 3(b) is Ambiguous

There is only one other argument for breach of contract that the Court cannot resolve on summary judgment:  M&A's contention that Eli Global breached the second sentence of section 3(b) of the Consulting Agreement.  That provision provides that "In the event that the Company pursues a purchase of all or part of the capital or equities and/or assets of Target, then in such an event, M&A shall act as the Company's advisor and assist the Company, as directed, in the due diligence, valuation work, and negotiations on the terms and conditions of any contract with Target or its shareholder."  Consulting Agreement § 3(b).  It is undisputed that SNIC, as an insurance company, was a "Target" as that word was defined in the contract.  Therefore, M&A contends, Eli Global's "pursuit" of SNIC required that M&A would serve as the Company's advisor.  *See* Pl.'s Mot. for Summ. J. at 14-15.  Unlike the first sentence of section 3(b), which specifically refers to a transaction's "closing," M&A argues that this second sentence covers Eli Global's pursuit of SNIC, which occurred during the term of the contract.

This sentence is ambiguous in the context of the agreement as a whole.  Although M&A's reading of the provision reflects the language of that sentence of the agreement read in isolation, multiple contextual clues suggest that it was not the intent of the parties for the second sentence of section 3(b) to require M&A to serve as the "Company's advisor" for the pursuit of any and all targets.  First, M&A's proposed reading of the second sentence of section 3(b) of the Consulting Agreement would mean that Eli Global would be required to use M&A as an advisor for *any* insurance company it was interested in, regardless of whether M&A connected Eli Global to that insurance company.  This is fundamentally inconsistent with the first sentence of the Consulting Agreement, which describes the contract as a "Non Exclusive Consulting and Advisory Agreement."  To read the second sentence in section 3(b) as M&A suggests would render the Consulting Agreement an exclusive agreement in contradiction of the first sentence of the agreement.

23

Second, the sentence at issue is located in the paragraph of the agreement concerning Success Fees for transactions that result in a closing. The structure of the Consulting Agreement suggests that any obligations or responsibilities for M&A to provide advisory services outside of the context of a specific transaction that proceeds through closing would be governed by section 1. *See* Consulting Agreement at page 1 ("WHEREAS, (1) the Company wishes to engage M&A to provide the Services set out in Section 1 and will in consideration therefore pay to M&A the Compensation set out in Section 3 . . . ."). The sentence at issue is located within section 3(b), which covers Success Fees upon closing. As a result, it could reasonably be construed to apply specifically only to transactions that result in a closing—the subject of the remainder of that subsection. Read in that way, the provision would only require that Eli Global use M&A as an advisor in connection with a deal that closes, or is expected to close, during the term of the agreement. Because this sentence is ambiguous, the Court cannot find that either party is entitled to summary judgment as to the claim that Eli Global breached this particular obligation.

As such, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART as to the breach of contract claim, leaving open the question of whether Eli Global breached the second sentence of section 3(b) of the agreement, which the Court has found to be ambiguous. The Court will permit the parties to provide it with evidence regarding the intended meaning of this term as used in the Consulting Agreement.[4]

### C. Implied Covenant of Good Faith and Fair Dealing

Plaintiff argues that, if the Court concludes that Eli Global did not breach an express provision of the Consulting Agreement, Defendants' actions give rise to a separate cause of action for breach of the implied covenant of good faith and fair dealing. Plaintiff urges the Court to find

---

[4] The Court is aware that there is testimony submitted in support of the cross summary judgment motions which suggest that the parties did not intend to create an exclusive contract. *See* Procops Dep. Tr. 195:24 – 196:6. However, because the parties did not focus on the second sentence of section 3(b) of the agreement as potentially ambiguous, they have not fully presented this issue to the Court.

24

that Defendants acted in bad faith by deliberately structuring their deal in order to avoid payment of the Success Fee under the contract.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (citing *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989)). The implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002) (internal quotation marks omitted) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). That said, a party cannot use the implied covenant to "add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (brackets, internal quotation marks, and citation omitted); *accord Murphy v. Am. Home Products Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983) ("No obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship."). Nor may the Court interpret the implied covenant to "extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 281 N.E.2d 142, 145 (N.Y. 1972)).

Plaintiff primarily argues that Eli Global breached a covenant of good faith and fair dealing by using a newly-formed shell company to consummate the acquisition of SNIC. Pl's. Mot. for Summ. J. at 20. Plaintiff posits that the entity was created to evade Eli Global's obligation to pay M&A a Success Fee upon closing of the transaction. However, as described above, the Court agrees with Plaintiff's construction of the Consulting Agreement. The agreement required the payment of a Success Fee whenever a controlled entity closed on an acquisition of a target, not only upon a direct acquisition by Eli Global. Therefore Eli Global's decision to create a shell company which it controlled would not have impacted its obligation to pay a Success Fee if the acquisition had been

consummated during the term of the Consulting Agreement.  Eli Global's decision to acquire SNIC through Southland Holdings did not amount to a breach of the implied covenant.

Second, Plaintiff argues that Eli Global breached the covenant of good faith and fair dealing by terminating the Consulting Agreement surreptitiously, at a time when it knew that the transaction with SNIC was imminent.  Pl's. Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 110 at 16-17.  This argument also fails, because the termination provision of the Consulting Agreement does not provide that termination must be undertaken in good faith.  "Under New York law, where the parties to a contract have agreed to a written termination clause, it must be enforced as written." *Joseph Victori Wines, Inc. v. Viña Santa Carolina S.A.*, 933 F. Supp. 347, 352 (S.D.N.Y. 1996).  "Where a termination clause permits the parties to terminate an agreement at will on . . . written notice, the courts do not qualify an otherwise absolute power to terminate by requiring termination to be in good faith." *Id.* at 353 (citing *Alco Standard Corp. v. Schmid Bros., Inc.*, 647 F. Supp. 4, 7 (S.D.N.Y. 1986) (internal quotations omitted)).  The termination clause of the Consulting Agreement simply states that "either party may cancel this agreement with 30 day prior written notice to the counterparty," and does not require that termination must be for cause or in good faith.  Consulting Agreement at § 2.  Like the termination clause in the contract at issue in *Joseph Victori Wines*, the clause in the Consulting Agreement permitted termination without cause on written notice, and therefore the Court will not build a "good faith" requirement into the section 2 of the agreement. While the Court appreciates Plaintiff's frustration with Defendants' choice of timing, M&A was aware of the possibility that a client could act as Defendants did here, and Plaintiff contracted to protect itself through the fee tail provision discussed at length above.  Plaintiff cannot use the implied covenant to add more protection against tricky termination than it negotiated in its express contract.

Finally, M&A argues that Eli Global "deliberately hid" its pursuit of SNIC.  Pl.'s Mot. for Summ. J. at 13.  However, as Defendants note, the Consulting Agreement did not obligate Eli

Global to notify M&A of its pursuit of potential acquisition targets—even those previously identified by M&A.  Defs.' Brief in Support of Mot. for Summ. J., Dkt. No. 96, at 14.  The agreement does not even require such notice with respect to targets "Introduced" by M&A to Eli Global.  The agreement requires payment at any closing pursuant to the fee tail, but it does not require notice of the initiation of conversations that might ultimately trigger that requirement. Section 10 of the Agreement only requires Eli Global to make available information "that M&A may request."  The Court will not do as Plaintiff requests and "add to the contract a substantive provision not included by the parties."  *Broder*, 418 F.3d at 199.

The Court recognizes that this argument is closely related to the requirement under the second sentence of section 3(b) of the Consulting Agreement that M&A serve as the Company's advisor in the pursuit of a target.  As the Court determined that the second sentence of section 3(b) is ambiguous, it has not yet determined that this requirement in fact existed under the Consulting Agreement.  To the extent the Court finds, after further evidence is presented, that such a requirement existed, Plaintiff could not simultaneously pursue a claim for a breach of an implied covenant.  *See JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-cv-9116 (PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009) (quoting *Grand Heritage Mgmt., LLC v. Murphy*, No. 06-cv-5977 (NRB), 2007 WL 3355380, at *6 (S.D.N.Y. Nov. 5, 2007)) ("[T]o simultaneously plead breach of contract and implied covenant claims under New York law, a plaintiff must allege an implied duty that is consistent with the express contractual terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims.").  Because any obligation for Eli Global to inform M&A of its pending transaction with SNIC would be based upon the same factual predicate as the failure of M&A to serve as the Company's advisor, Plaintiff cannot bring both claims.  Alternatively, if the Court later determines that there was no obligation for Eli Global to use M&A as its advisor in the SNIC transaction, the Court will not otherwise read

a duty to inform into the contract.  Thus, summary judgment in favor of Defendants is GRANTED as to this claim.

### D.  Unjust Enrichment and Quantum Meruit

Defendants also move for summary judgment on the remaining three claims brought by M&A:  unjust enrichment, quantum meruit, and tortious interference.  Plaintiff does not cross-move for summary judgment on these claims.

Under New York Law, quantum meruit and unjust enrichment can be analyzed together as one quasi-contract claim.  *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).  This is because "quantum meruit and unjust enrichment are not separate causes of action; rather, unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract."  *Di Simone v. CN Plumbing, Inc.,* No. 13-cv-5088, 2014 WL 1281728, at *6 (E.D.N.Y. Mar. 31, 2014) (internal quotation marks omitted).  "To prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered . . . ."  *Id.* at *5 (internal quotation marks omitted).  "In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  *Mid-Hudson,* 418 F.3d at 175 (quoting *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 69 (2d Cir. 2000)).

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)).  Here, Plaintiff contends that to the extent the Court accepts that Eli Global's affiliates are not

bound by the Consulting Agreement, the agreement itself is not a bar to the quasi-contract claims against those affiliates.  Pl's. Opp'n to Defs.' Mot. for Summ. J. at 18-19.  That is not what New York contract law requires, however.  The law states that a contract governing a particular *subject matter*—not necessarily as between the same parties—precludes quasi-contract claims; a person who is not a party to the agreement may be shielded by that bar.  *See Air Atlanta Aero Engineering Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) (finding that under New York law, quasi-contractual claims are precluded by the existence of a contract governing the subject matter of the dispute even against a third party that is not a party to that agreement).  The quasi-contract claims that Plaintiff pursues here are clearly within the subject matter covered by the Consulting Agreement; Plaintiff seeks recovery for services provided by M&A to Eli Global related to the acquisition of SNIC by Eli Global (or, as explained above, by Eli Global's controlled subsidiaries or affiliates)—all of which falls within the scope of the Consulting Agreement.  Thus Plaintiff is barred from bringing quasi-contractual claims against the Defendants—regardless of whether or not they were parties to the agreement.

While the Court need not reach this question, the Court observes that even if these claims were not precluded by virtue of the existence of a valid contract, M&A could not sustain quasi-contractual claims against Southland Holdings or SNA because M&A's services were not provided to those entities.  "Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated."  *See Mandarin Trading, Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110-11 (N.Y. 2011) (finding that the relationship between the buyer of a painting and the painting's appraiser was too attenuated where there was no direct contact between appraiser and buyer).  Here, the record clearly shows that the last communication between M&A and Eli Global concerning SNIC took place in February 2014.  Southland Holdings was incorporated on April 28, 2014.  Herwig Aff. Ex. D.  SNA was incorporated on May 12, 2014.  Herwig Aff. Ex. B.  M&A's relationship with those two entities was quite attenuated—they did not

exist when M&A was performing under the Consulting Agreement.  Without a basis to disregard those affiliates' separate corporate existence from Eli Global, the Court cannot conclude that these later-created entities could have benefited from M&A's work for Eli Global.  Defendants' motion for summary judgment on Plaintiff's claims for quantum meruit and unjust enrichment is GRANTED.

### E.  Tortious Interference

"Under New York law, a tortious interference claim requires a showing that a valid contract exists and that a third party with knowledge of the contract intentionally and improperly procured its breach."  *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 88 (2d Cir. 2005).   In order to succeed on a claim for tortious interference, a plaintiff must prove that the underlying contract has been breached.  *AIM Int'l Trading, L.L.C. v. Valucine, S.p.A.*, No. 02-cv-1363, 2003 WL 21203503, at *4 (S.D.N.Y May 22, 2003) (citing *Jack L. Inselman & Co., Inc. v. FNB Fin. Co.,* 364 N.E.2d 1119, 1120 (N.Y. 1977) ("In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party . . . .")).

The only argument that Plaintiff makes in opposition to Defendants' motion for summary judgment on this claim is that the non-Eli Global Defendants set up Southland Holdings and SNA to allow Eli Global to close on the acquisition of SNIC indirectly in order to evade its payment obligations.  However, the Court has already found that action did not a breach the contract:  again, if M&A had satisfied the conditions under the contract, the acquisition of SNIC through a controlled Eli Global affiliate or subsidiary would have triggered Eli Global's obligation to pay a Success Fee.  Plaintiff has not presented any other evidence that there was alleged interference that led to a breach that resulted in damages.  Defendants' motion for summary judgment on Plaintiff's claim for tortious interference is therefore GRANTED.

## V.    DEFENDANTS' MOTIONS TO STRIKE

In support of its motion for summary judgment, M&A submitted affidavits from Betty

Rodriguez and M&A President Donald A. Emeigh.  Dkt. Nos. 92 and 93.  Defendants moved to

strike both affidavits.  Dkt. No. 113.  In its opposition to Defendants' summary judgment motion,

Plaintiff submitted an affidavit from M&A Vice President Paul Procops.  Dkt. No. 111.  Defendants

also moved to strike that affidavit.  Dkt. No. 135.  In its opposition to the motion to strike the

Procops' affidavit, Plaintiff submitted another declaration from Donald A. Emeigh.  Dkt. No. 149.

Defendants also moved to strike the second Emeigh declaration.  Dkt. No. 153.

Defendants set forth arguments as to why, under Federal Rule of Civil Procedure 56(c)(2),

the Court should move to strike these affidavits.  The 2010 Committee Notes to that subsection,

however, explain the following:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  The objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.  *There is no need to make a separate motion to strike.*  If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

(emphasis added).  As the Court "may consider only admissible evidence in ruling

on summary judgment, it sees no need to 'strike' any portions of [Plaintiff's] evidence."  *Ferraresso v.*

*Town of Granby*, 646 F. Supp. 2d 296, 301 (D. Conn. 2009) ("[I]n the context of summary judgment,

motions to strike are unnecessary and produce only redundant statements by the court that it has

not relied on such inadmissible evidence in deciding the summary judgment motion.") (citing *Martin*

*v. Town of Westport*, 558 F. Supp. 2d 228, 231 (D. Conn. 2008)).  It is not necessary for the Court to

evaluate every paragraph of each challenged affidavit, but the Court has not relied upon any

evidence submitted that is not supported or admissible.  *Sauerhaft v. Bd. of Educ. of Hastings-on-Hudson*

*Union Free Sch. Dist.*, No. 05-cv-09087, 2009 WL 1576467, at *8 (S.D.N.Y. June 2, 2009) (holding

that in the context of motions to strike evidence submitted in support of a summary judgment

motions, "[a] court may decline to conduct a line-by-line analysis and instead simply disregard the allegations that are not properly supported").  Defendants' motions to strike are therefore DENIED, although the objections raised in the motions were considered in the Court's evaluation of the evidence presented in support of summary judgment.

## VI.   PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

On May 13, 2016, Plaintiff filed a notice of motion to amend the complaint.  Dkt. No. 126. The notice of motion referred the Court to a footnote in its motion in opposition to Defendants' motion for summary judgment.  Dkt. No. 110 n.22.  Plaintiff did not include with its notice of motion a memorandum of law or supporting affidavits as required by Rule 7.1(a) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.  Plaintiff's motion is therefore DENIED without prejudice.

* * *

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 90, 95, 113, 126, 135, and 153.

SO ORDERED.

Dated:  March 27, 2017
New York, New York

_____
GREGORY N. WOODS
United States District Judge